Booth, Judge,
delivered the opinion of the court:
Plaintiff company, a West Virginia corporation, sues to recover for an alleged infringement of a patented device. On May 14, 1902, Horace S. Carley filed an application for letters patent on certain new and useful improvements in life rafts. On June 18, 1903, Carley duly assigned to’ plaintiff his title and interest in said application; and on July 21, 1903, letters patent were granted to Carley and duly issued as No. 734118. This litigation is the result of a series of contracts entered into by the Government with the Athens Shipbuilding Corporation of New York for the manufacture and delivery to the Government of a number of “ elliptical tubular life floats.” The plaintiff contends that the life floats manufactured by the Athens Company for the Government under the above contracts are duplicate copies and exact reproductions of the life float covered by Letters Patent No. 734118. The findings set forth claims 1, 2, 3, and 4 of Carley’s patent — i e., the claims involved. The defendant rests it,s case upon two primary defenses: First, claims 1, 2, 3, and 4 are challenged as invalid because they recite an inoperative structure, one lacking in utility and anticipated by the prior art. Second, granting the validity of the claims, they were not infringed by the defendant for the reason of nonuser. The record is a large one. Carley was a practical sailor. He became interested in life-saving devices prior to 1899, for, as appears from Finding VI, he secured on July 4, 1899, a patent for a lifeboat.
The prior art discloses that antedating Carley’s advent into the field there existed at least four types of life-saving apparatus, (1) lifeboats capable of expeditious launching from the decks of ships; (2) life rafts to be thrown overboard from the deck of the ship, or to be loaded with pas *525 sengers and float off when the ship sank; (3) individual life preservers adjustable to the body and capable of sustaining persons afloat in the water, and (4) life buoys, a circular device to be thrown overboard and grasped by a person in the water. Carley originally conceived the idea of deviating from the existing types in the important particular of designing a collapsible and reversible life float capable of performing a service superior in extent to and available with greater expedition than anything which had gone on before. What he was seeking to do was to construct a life float so compact when collapsed that great numbers could be readily carried aboard ship, and when cast overboard in times of excitment and emergency would not fail to operate, accommodating the maximum number of passengers. To this end the inventor designed his first float, and, as much stress is put upon the claims of patent No. 627979 as anticipatory of certain elements in the patent in suit, discussion of the same becomes important.
Carley’s first patent, No. 627979, is illustrated by the accompanying figure.
The predominating ideas of the inventor in this patent are illustrated in the attempt to specify and construct a lifeboat collapsible, reversible, noncapsizable, and of sufficient strength to withstand the pressure of sudden usage at sea. Departing from the raft type of life-saving devices, Carley was impressed with the making of a float more in keeping with the lifeboat type, wherein he employs a suspended platform or bottom by means of a flexible netting attached to the inner side of a buoyant frame, resulting in a partial submergence of the passengers utilizing the same. Reversibility was a new idea. Carley’s patent illustrates the conception; no matter which side of the buoyant frame strikes the water, the float is available immediately. To accomplish the result, the claims of the patent disclose a construction embodying an elliptical float body; i. e., buoyant body around which is encircled at intervals rings d2 of rope or metal, fitting loosely. Upon each of the loose-fitting rings d2 inside the float body is attached slidable eyelet d1, which are also attached to the upper edge of the netting,

*526

*527 which in turn supports the bottom, thereby resulting in a degree of slack sufficient in extent to allow the free movement of the eyelets along the encircling rings of metal or rope on the inside of the buoyant body through which the bottom of the device may pass, irrespective of contact with the water. Obviously the encircling rings of rope or metal come in close contact with the buoyant body at but one point, and that is at the top thereof. To provide against the longitudinal displacement of the encircling rings of rope or metal, Carley employed in this patent a series of eyebolts, h, securely attached to the outside of the buoyant body by perforation of the same, and through which the encircling rings passed, and through which life rope H was likewise passed, the inventor specifiying life line H as “ attached at intervals in eyelets h, through which rings d2 pass.” The difficulty which this device encountered lay primarily in the construction of the encircling rings and their attachment to the buoyant body. It was indispensable to so adjust the parts of the device as to in no way impede the free and easy movement of the bottom of the float through the buoyant body in either direction. To do this required the maintenance of almost perfect alignment of the bottom supported by the netting with the bouyant body. Carley’s encircling rings in this patent failed to respond to the necessities of the case; the eyebolts on the outside of the bouyant body were frequently broken off or failed to withstand the pressure of usage, resulting in holes where they had been secured and destroying the buoyancy of the float. As a matter of fact, Carley’s first patent signally failed in obviating longitudinal displacement and was of very little, if any, practical or commercial value. It could not be relied upon, and reliability in cases of very great excitement and acute emergency was essential.
An analysis of the specifications and claims of this patent fails to show what we are here concerned with, viz, a draw-rope construction. Rope H served no such purpose. This rope, extending completely around the buoyant body, hung loosely in festoons, and to it were attached at intervals a multiplicity of smaller ropes, rendered buoyant by wooden *528 or cork floats as life lines. Carley, to attain the reversibility of the bottom of the float, relied exclusively upon loose encircling rings of rofe or metal, secured to the sides of the buoyant body by eyebolts. He does not seem to have conceived the idea of employing ropes so adjusted and arranged as to furnish the necessary pressure to avoid longitudinal displacement and disruption of nice alignment. If so, he would not have specified rings of rofe or metal. A lifesaving device subject to disarrangement and fraught with danger of lack of utility is manifestly without commercial value, even though under exceptional circumstances and in places other than a wreck at sea it may be made to work in a single instance. The Government, through the proper officers of the Navy, found this type of Carley lifeboats inoperative after experimentation with sixteen of the same, and they were not used. The “ chain and ring ” construction was a decided failure.
Letters Patent No. 734118, here involved, clearly disclose a wide and important departure from the elements of the device going into the construction of Carley’s prior lifeboat. Figure 1 represents a perspective view of the patent in suit. We reproduce it, as well as Figure 2.
Claim 4 of this patent accurately depicts the inventor’s “ draw-rope construction.” The buoyant body is encircled at intervals with what is designated as rope rings, formed of a single strand of rope, with eyes or loops at each end, identified in Figure 1 by the letter M, in Figure 2 by M1 and M2. The rope rings thus formed are secured to the buoyant body by passing one loop through the other, one loop having a metal ring n attached thereto through this metal ring, or through an extended portion of the looped ends is threaded the backbone rope O, thus preventing the separation of the rope rings; 90° around the buoyant body in both directions from rope O appear drawropes p and p1, extending longitudinally of the same. Ropes p and p1 cross the encircling ropes M and are bound thereto as shown at q. Ropes p and p1 are drawn tightly, pulling the outer halves of the rope rings M compactly and rigidly against the outer surface of the buoyant body and leaving the inner halves M3 sufficiently slack so that the rings r may move freely thereon.
*529 By this method of draw-rope construction Carley accomplished the novel idea of encircling the buoyant body in such a way as to secure a tight, immovable, nonshifting ring of rope, sufficiently slack at the desired point to accommodate the reverse movement vital to free passage of the bottom of the float through the orifice of the buoyant body. Proper alignments were maintained, and the ropes employed were made to function both as to their tensile strength in bearing a load and giving needed pressure to maintain stability. The patent was a success. The Government used it, and to within a very few months of the expiration of the patent its validity had never been challenged by either the Government or anyone else.
In what respect does the device made for and used by the Government differ from the Carley patent in suit? This we think appears from defendant’s exhibit reproduced herewith.
The difference in structure upon which the defendant relies as determinative is the absence of the draw ropes p and p1 from the float made by the Athens Company for the Government, and in their place the zigzag or shoe-lace arrangement of the draw ropes. The defendant contends that the zigzag construction attains the result by a “ lacing action,” a crisscross pull similar to shoe laces, and the Carley patent depends upon a “ draw-string action.” The, refinement is extremely technical. To sustain the defense emphasis is put upon the word “ longitudinally ” in Carley’s claims “ draw ropes extending longitudinally along the upper and lower sides of the buoyant body,” the defense insisting that the zigzag draw ropes in the Athens model do not extend longitudinally but crisscross fashion. Plaintiff in reply pertinently observes that Carley’s claims do not use the words “ in an undeviating line longitudinally,” and what is more Carley’s device was made in the shops of the plaintiff by employing the zigzag draw-rope construction and marketed with the same disclosed long before the Athens Company did the same thing. It was in no sense unusual. Defendant does not dispute the identity of results. Beyond disputation is the fact that the Athens type of float reaches the same end by utiliz-

*530

*531 ing the same elements in a slightly different way. Carley recognized the prime necessity for rope rings so constructed as to permit a degree of slack on the inside of the float and high pressure on the outside if he was to attain the desired reversibility of the bottom. This essential feature of the device was likewise important to the Athens corporation. It characterizes the invention; it is indispensable to efficient operation. May it then be said that by the adoption of a mere change in form Avthout a substantal change in result, or functioning of the elements of a prior patent, a user may escape infringement? One skilled in the art could, without doubt, have obtained from a mere physical inspection of Carley’s life float the idea embodied in the Athens float. Seemingly it required no originality to do what the Athens corporation did in constructing its float. At least no patent was applied for. In Graham v. Mason, 5 Fish. 11, affirmed by the Supreme Court in Mason v. Graham, 23 Wall. 213, the Supreme Court said:
“ Infringement depends not so much upon the form of the particular device in question or upon the name given to it in the specification as upon the functions it performs, and it is well-settled law that if one device is employed in a similar combination as another and performs the same function in the same way, the two are substantially the same, although they may be different in form and may be known among mechanics by different names.”
We can not escape the conclusion that what was done in the Athens factory was the equivalent of the Carley patent. The case of Central Foundry Co. v. Coughlin, 141 Fed. 91, 94, illustrates the fact. In this case the court said:
“An equivalent is defined as a thing which performs the same function, and performs that function in substantially the same manner, as the thing of 'which it is alleged to be an equivalent.”
In our view of the case, to take away from Carley the fruits of an invention never heretofore challenged, although used by the Government and others, well known in the art, useful and valuable, upon the narrow and extremely technical contentions interposed herein would be extending the patent laws beyond their legal scope.
*532 Defendant earnestly contends that Caiiey’s top and bottom ropes were completely anticipated in the patent granted to Kopcke, No. 456G21, July 28, 1921. Kopcke, it is true, was attempting the construction of a life preserver, but his ideas and Carley’^ ideas were decidedly distinct. Kopcke’s invention embodied no idea of reversibility and in no way involved a roping system wherein draw ropes were to

Defendant’s exhibit. Float made by the Athens Co. for the Government
function so as to attain rigidity at one point and requisite slack at another, furnishing the means for reversibility and collapsibility. Kopcke’s netting to support passengers was made .secure and was incapable of shifting, and was simply “securely fastened to the inner periphery of the ring, preferably by means of the rope d ” for the single purpose of sustaining taut the netting relied upon as a bottom. Of course, when air was introduced into Kopcke’s circular tubes the ropes became taut. Surely no claim may *533 be advanced that this was the invention of a rope construction as the term is used in this case. One might well have examined the Kopeke patent in all its details without receiving a single suggestion useful to the construction of the Carley patent.
It is quite unnecessary to discuss an argument predicated upon the inoperativeness of the device disclosed in Carley’s patent. One fact effectually disposes of the contention. The Government during the war adopted the device, used it extensively, and engaged the Athens Company to make it in numbers. The defendant as to this particular issue vigorously asserts the workability of Carley’s first patent in order to predicate a defense of anticipation in the prior art, Carley’s first patent having become public, and seemingly uses the same state of facts to demonstrate the inoperativeness of the patent in suit. The record does not sustain a contention that the patent in suit was inoperative. On the contrary, the longitudinal crisscross arrangement of the draw ropes is in exact accord with prior construction by the plaintiff in its shops, a fact which was publicly known and which is not proven to have been the single essential element of the patent vital to its operativeness. The defendant was fully acquainted with the patent in suit, knew its detail of construction, and was familiar with the types made and sold by the plaintiff. The record fully sustains the findings of the court in this respect.
The plaintiff is entitled to a judgment. The case will be remanded to the general docket as per stipulation of the parties for proof as to damages. It is so ordered.
Moss, Judge; Geaham, Judge; Hat, Judge; and Campbell, Chief Justice, concur.